IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | |
| ) | Criminal Action No. 07-38-JJF |
| CRISTIAN OREJUELA ) | |
| aka Christian Munoz, ) | |
| ) | |
| Defendant. ) | |

### GOVERNMENT PRE-HEARING RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS

**NOW COMES** the United States of America, by and through its undersigned attorneys, and hereby responds to Defendant's Motion to Suppress Physical Evidence and Statements, and respectfully requests that, after an evidentiary hearing, this Court deny the Motion for the reasons that follow:

**I.   Introduction**

On March 15, 2007, the federal grand jury for the District of Delaware returned a one count Indictment, which charged that, on February 18, 2007, the defendant, Cristian Orejuela, was an illegal alien in possession of a firearm, in violation of 18 U.S.C. § 922(g)(5). On May 10, 2007, the defendant filed a Motion to Suppress Physical Evidence and Statements. An evidentiary hearing on this Motion has been scheduled before this Court on July 10, 2007.

**II.   Factual Background**

The government expects that the evidence at the suppression hearing will show the following facts:

On February 18, 2007, at approximately 12:50 am, police received a report of a shooting in the parking lot outside a dance club called Las Palmeras, located in the Fox Run Shopping Center

in Bear, Delaware. Detectives from the Delaware State Police arrived on scene and found that the victim of the shooting had been hit with a bullet in the foot. Police interviewed witnesses at the scene, and obtained a tag number and description of the shooter's vehicle as a older model, black Acura with a shattered back windshield. The tag number initially provided, XB5449868, contained one too many numbers. By attempting several different combinations, however, police were able to locate a older model Acura with temporary registration XB544986, which was registered to Nubia Munoz, the defendant's mother, at 2 Candlewick Court, New Castle, Delaware. Witnesses also provided a description of the shooter as a white, Hispanic male, wearing dark pants and a polo shirt with black, gray and white horizontal stripes.

Based on this information, two officers went to 2 Candlewick Court, New Castle, Delaware. A black Acura, with a shattered windshield, and Delaware temporary tag number XB544986, was parked directly in front of this residence. Surveillance was established and officers saw a male wearing a white baseball hat and hooded jacket exit the residence, search through the vehicle, and then return to the house.

After the arrival of back-up units, Sgt. Joseph Spagnolo knocked on the front door, which was answered by the defendant's mother, Nubia Munoz and her boyfriend. Ms. Munoz and her boyfriend permitted the officers to enter the residence and Ms. Munoz executed a written, Spanish language consent to search the house and the vehicle. Ms. Munoz indicated that her son, the defendant, was upstairs, and also told the officers that he had been driving the black Acura earlier that night. When the defendant came downstairs, he was wearing clothes which matched the description given by the eyewitnesses. Sgt. Spagnolo asked him whether he was driving the Acura that night, and whether he had been at the nightclub that evening – and the defendant gave

2

affirmative answers to both questions. He was then handcuffed for officer safety, and was given the *Miranda* warnings.[1] After acknowledging that he understood each warning, the defendant gave a post-*Miranda* statement in which he admitted to shooting the firearm and to throwing it out his car window. Following the interview with Sgt. Spagnolo, the defendant was taken to the Delaware State Police, Troop 2, headquarters. No physical evidence was obtained from the residence or the vehicle.

At headquarters, the defendant was interviewed by Detective John Penrod and Task Force Officer Alberto Garcia, neither of whom had been present earlier at the residence. After the defendant stated that he understands English, Detective Penrod administered the *Miranda* warnings.[2] The defendant acknowledged that he understood each right, and then gave a post-*Miranda*, videotaped statement in which he admitted that he had been in a physical altercation with the victim, that he had shot him, and that he threw the firearm out the car window along Route 40. The defendant claimed he was acting in self defense and that he shot at the ground.

Delaware State Police were subsequently able to find the gun on the shoulder of Route 40, at approximately the location described by the defendant. The firearm was a loaded .45 caliber handgun — the same caliber as used in the shooting.

After it was determined that the defendant was an alien and here illegally, he was interviewed by Special Agent Michael Deshaies of the Bureau of Immigration Customs Enforcement on March 9, 2007. Special Agent Deshaies gave the defendant the *Miranda* warnings in Spanish and had the

---

[1] The warnings were given in English. The evidence will show, however, that the defendant is proficient in English and that he understood his *Miranda* rights.

[2] The defendant was aware that TFC Garcia speaks Spanish and was told by TFC Garcia that he could explain anything in Spanish if he felt unable to do so in English. The remainder of the interview with Detective Penrod, however, was conducted in English.

defendant execute a written Spanish language waiver of his *Miranda* rights. The defendant then gave a sworn statement, in which he admitted to being a citizen of Columbia, and admitted to getting a pistol out of his car and shooting it. He claimed, however, that he was trying to defend himself and that he shot the gun into the ground.

### III.   Legal Argument

The defendant contends that the firearm and other evidence should be suppressed because the police lacked probable cause to arrest him, and lacked a search or arrest warrant permitting entry into the residence at 2 Candlewick Court. He also claims that he was interviewed by the police without receiving or understanding his *Miranda* rights and asks this Court to suppress statements on that basis. For the reasons that follow, these arguments are each without merit.

### A.   *The Entry Into the House Was Consensual and the Police Had Probable Cause to Arrest the Defendant Once Inside.*

As a threshold matter, no warrant was required for the police to enter the house because Ms. Munoz and her boyfriend voluntarily consented to the entry, and Ms. Munoz executed a written consent form to search both the house and the vehicle.[3] *See Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); *United States v. Matlock*, 415 U.S. 164, 170-71 (1974).

---

[3]Even if the entry into the home were not valid, so long as there was probable cause to arrest the defendant, the his statements at police headquarters and to Special Agent Desheais would be admissible. *See New York v. Harris*, 495 U.S. 14, 20 (1990) (refusing to suppress statements made by the defendant at the station house after police entered the defendant's home without a warrant and arrested him, finding that "[t]he warrant requirement for an arrest in the home is imposed to protect the home, and anything incriminating the police gathered from arresting Harris in his home, rather than elsewhere, has been excluded . . . . We are not required by the Constitution to go further and suppress statements later made by Harris"). Similarly, the gun, which was recovered on the public roadway would also not be suppressed. There was no physical evidence recovered from the defendant's house.

Once inside the house, the officers located the defendant and placed him in handcuffs for officer safety. Given that the defendant was suspected of shooting another individual a few hours earlier, and that an individual had been seen going into the black Acura used to flee from the scene of the shooting, the use of handcuffs was appropriate for officer safety while the consent search of the house was being conducted. *See Torres v. United States*, 200 F.3d 179, 187 (3d Cir. 1999) (permitting the handcuffing of residents during the duration of a search of the house where officers have reason to be concerned for their safety).

At any rate, the officers had probable cause to arrest the defendant based on the information already in their possession at the time the defendant was handcuffed. The description of the shooter given by eyewitnesses was consistent with the defendant, the black Acura used to flee the scene of the shooting was parked outside the house, and the defendant's mother told the officers that the defendant had been driving that car earlier in the evening. *See Government of Virgin Islands v. Williams*, 739 F.2d 936, 939 (3d Cir. 1984) (finding probable cause to search vehicle where police investigating a burglary saw yellow Mazda car with matching license plate, driven by a Hispanic male wearing a blue and white checkered shirt thirty minutes after receiving a matching description of the burglary suspect and his car); *see also United States v. Street*, 472 F.3d 1298, 1305 (11th Cir. 2006) (probable cause where tag number matched car defendant had rented earlier that morning and defendant matched physical description of bank robber).

### B.  *The Defendant Received and Understood the* **Miranda** *Warnings and Voluntarily Agreed to Speak with Police.*

When the defendant came downstairs, the police asked him two questions about his whereabouts that evening. He was then handcuffed and mirandized. After agreeing that he understood each right, he gave a voluntary statement to the police detailing his version of what

occurred earlier in the evening. Later at police headquarters, the defendant was interviewed by two Delaware State Police officers, neither of whom had been present at the house. He again received the *Miranda* warnings, agreed that he understood each right, and gave a voluntary statement which was materially similar to the statement given earlier. A third interview was conducted approximately three weeks later, by Special Agent Deshaeis in which the defendant repeated his version of events after receiving the *Miranda* warnings in Spanish.

1. The Two Pre-*Miranda* Questions Do Not Require Suppression of Subsequent Statements Under *Elstad* and *Seibert*.

The Government concedes that the defendant's responses to the two initial questions were given without the benefit of the *Miranda* warnings. However, the defendant's subsequent statements — at the house, at the police headquarters, and to Special Agent Deshaies — were given after full and careful administration of the *Miranda* warnings, and therefore are admissible. *See Oregon v. Elstad*, 470 U.S. 298 (1985). Indeed, the facts of this case are closely analogous to the facts of *Elstad*. In *Elstad*, the police went to a burglary suspect's house to take him into custody on a charge of burglary. Before the arrest, one officer spoke with the suspect's mother, while the other officer spoke briefly with the suspect, who acknowledged, in response to police questioning, that he knew the victim and that he had been at the scene. The suspect was then taken back to the station house, and gave a full confession after receiving the *Miranda* warnings. *Id.* at 301-02. The Supreme Court refused to suppress the subsequent, post-*Miranda* statement, holding:

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the

>admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Id.* at 309.

The Supreme Court in *Missouri v. Seibert*, 542 U.S. 600 (2004), has since created a limited exception to *Elstad* where police engage in a "strategy" to undermine *Miranda* by employing a "two-step" interrogation technique, in which the police first elicit a pre-*Miranda* confession in a manner that is "systematic, exhaustive, and managed with psychological skill," and only then administer the *Miranda* warnings and seek the same admissions. *Id.* at 616. In *Seibert*, the police interrogated the defendant at length prior to Mirandizing her, and then with only a short break, went over the identical ground with the defendant, eliciting a repeat of the first confession. *Id.* at 616-17. In suppressing the second statement, the plurality in *Seibert* considered the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second statements, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first. *Id.* at 617.

Justice Kennedy, who supplied the fifth concurring vote in *Seibert*, set forth the controlling test, however, and held that *Elstad* continues to permit the admission of the second, post-*Miranda* statement unless the police employed a two-step interrogation technique "in a calculated way to undermine the *Miranda* warning." *See United States v. Naranjo*, 426 F.3d 221, 231 (3d Cir. 2005). Even if the police did purposefully employ such a two-step interrogation technique, the defendant's subsequent statements can nevertheless be admitted if "curative measures are taken before the postwarning statement is made" which are "designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the

7

*Miranda* waiver." *Seibert*, 542 U.S. at 622 (Kennedy, J. concurring). Echoing the plurality, Justice Kennedy noted that a "substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn." *Id.*

The Government expects that the evidence will show that this case falls on the *Elstad* side of the line: the police asked the defendant only two brief questions prior to *Mirandizing* him, which merely established that the defendant was the driver of the car and had been present at the scene, before formally arresting him and immediately going over each of the *Miranda* rights individually. These pre-*Miranda* questions were neither complete nor detailed, nor were they an intentional effort to subvert *Miranda*. Moreover, the subsequent statements at the headquarters, and days later by Special Agent Deshaeis were accompanied by fresh *Miranda* warnings, in a new setting, administered by different police personnel, after the passage of time. Under either *Elstad* or *Seibert*, therefore, the defendant's statements at the house, at police headquarters and to Special Agent Deshaeis should be admissible.[4]

   2.   The Firearm Would Not Be Subject To Suppression Even If Found as a Result of a *Miranda* Violation.

Even if, *arguendo*, a *Miranda* violation occurred, the firearm should not be suppressed. The "fruit of the poisonous tree" doctrine does not apply to physical evidence recovered as a

---

[4] In addition, *Miranda* does not apply to the questions and responses regarding the whereabouts of the firearm under the public safety exception recognized in *New York v. Quarles*, 467 U.S. 649, 656 (1984) (refusing to require *Miranda* warnings when "police officers ask questions reasonably prompted by a concern for the public safety."). Once it was clear that the defendant had thrown a loaded the firearm onto a public highway, the officers need not have administered the *Miranda* warnings to question the defendant about the firearm's whereabouts. As in *Quarles*, the defendant's statements relating to the location of the firearm would be admissible even in the absence of the *Miranda* warnings.

8

result of a voluntary statement taken in violation of *Miranda*. *United States v. Patane*, 542 U.S. 630, 636-37 (2004). In *Patane*, officers went to the defendant's residence to investigate a violation of a restraining order and illegal possession of a firearm. *Id.* at 634-35. During the course of police questioning, the defendant told the officers where the firearm was located. Even though the Court found that *Miranda* was violated by the custodial interrogation of the defendant, the Court refused to suppress the firearm. *Id.* at 643-44; *see also United States v. DeSumma*, 272 F.3d 176, 180-81 (3d Cir. 2001) ("We hold that the fruit of the poisonous tree doctrine does not apply to derivative evidence secured as a result of a voluntary statement obtained before Miranda warnings are issued. Thus, even though the defendant's seized gun was secured as a result of his non-Mirandized statement, it was properly admitted.").

**WHEREFORE,** the United States requests that the Court deny, following the evidentiary hearing, the defendant's Motion to Suppress Evidence.

Respectfully submitted,

COLM F. CONNOLLY
UNITED STATES ATTORNEY

*/s/ Ilana H. Eisenstein*
BY:_____
Ilana H. Eisenstein
Assistant United States Attorney

Dated: July 6, 2007

## AFFIDAVIT OF SERVICE

I, Kathie Gray, an employee in the Office of the United States Attorney for the District of Delaware, hereby attest under penalty of perjury that on July 6, 2007, I electronically filed the foregoing **GOVERNMENT PRE-HEARING RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS** with the Clerk of Court using ECF which will send notification of such filing(s) to the following:

Edson A. Bostic, Esquire
Federal Public Defender's Office
First Federal Plaza, Suite 110
704 King Street
Wilmington, DE 19801
ecf_de@msn.com

/s/ Kathie Gray
_____
Kathie Gray
Office of the United States Attorney
The Nemours Building
1007 Orange Street, Suite 700
P.O. Box 2046
Wilmington, DE 19899
(302) 573-6277
kathie.gray@usdoj.gov