IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Criminal Action No. 07-38-JJF |
| | : | |
| CRISTIAN OREJUELA | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF
MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS**

Defendant, Cristian Orejuela, by and through his undersigned counsel, Edson A. Bostic, Federal Public Defender for the District of Delaware, respectfully submits this Memorandum of Law in support of his Motion To Suppress Physical Evidence and Statements. For the reasons set forth below, Mr. Orejuela seeks to exclude the Government's admission, at trial, of any and all statements that were obtained in violation of his Fifth Amendment rights, as well as physical evidence recovered because of those statements.

**I. INTRODUCTION**

On March 15, 2007, Mr. Orejuela was indicted for being a prohibited person in possession of a firearm, in violation of 18 U.S.C. § 922(g)(5). On May 10, 2007, Mr. Orejuela filed a Motion to Suppress Physical Evidence and Statements. The grounds for Mr. Orejuela's motion related to his arrest on or about February 18, 2007, and statements made prior to, during, and after the arrest. On July 10, 2007, this Court conducted an evidentiary hearing to determine Mr. Orejuela's suppression motion.

Mr. Orejuela challenges the admission of his statements, and submits that law enforcement officers obtained his statements in violation of his Fifth Amendment rights. Accordingly, Mr. Orejuela's statements must be suppressed and excluded at trial.

## II. FACTUAL BACKGROUND

### 1. Investigative Report Summary

On February 18, 2007, Cpl. Jones received a dispatch reporting a shooting in the Fox Run Shopping Center parking lot. A general broadcast described the suspect's vehicle as a black Acura with Delaware temporary registration number "XB544988." Cpl. Jones conducted a computer check to identify the owners and discovered an Acura registered to Nubia Munoz at 2 Candlewick Court in New Castle, Delaware.

Cpl. Jones contacted Sgt. Bartowski and informed him of the shooting. Sgt. Bartowski and Detective Penrod apparently spearheaded the shooting investigation. Sgt. Bartowski reported to police headquarters and talked to Angel Santana, the victim. Mr. Santana stated that he joined a fight that had started inside of Las Parlemeras, a bar, but alleged that he did not know the reason for the fight. Mr. Santana alleged that an unknown Hispanic male shot him in his foot as he walked to his car and fled the scene.

Sgt. Bartowski also spoke to Fabiola Mena, Mr. Santana's girlfriend. Ms. Mena confirmed Mr. Santana's claims regarding the fight and shooting. The witnesses provided police with a basic description of the suspect and the license tag number of his vehicle. A third witness supposedly informed police that the suspect was known to him as "Cristian Munoz," and stated that he worked with him.

In the meantime, Cpl. Jones and Cpl. Reinbold arrived at the residence and saw a black Acura

2

with Delaware temporary registration number "XB544986" parked in front of the residence. The vehicle's rear window was shattered, and Cpl. Jones alleged that he saw a Hispanic male peeking through the blinds of the residence. Cpl. Jones notified Recom, Sgt. Spagnolo and Sgt. Giles that the suspect's vehicle had been located. Cpl. Jones set up surveillance of the residence and vehicle and requested K-9 assistance.

Upon information and belief, Cpl. Jones, Sgt. Giles, Sgt. Spagnolo and Cpl. Reinbold knocked on the front door, immediately arrested Mr. Orejuela and transported him to the police station several hours later. During this time, Mr. Orejuela allegedly admitted to being involved in the shooting, and Cpl. Jones obtained written consent from Nubia Munoz to search the home and vehicle. The residential search produced no evidence, and the vehicle was towed.

Law enforcement officials alleged that they provided Mr. Orejuela with his Miranda rights, and he allegedly agreed to talk to Det. Penrod. Mr. Orejuela subsequently admitted to shooting Mr. Santana, and stated that he threw the gun out of his car along Route 40 when he fled the scene. The gun was later recovered by Trooper Malkin along Route 40.

### 2. Evidentiary Hearing Testimony

At the evidentiary hearing, the government presented the testimony of: (1) Sgt. Joseph Spagnolo; (2) Detective John Penrod; and (3) Special Agent Michael John DeShaies. Mr. Orejuela presented the testimony of Jeremy Nye. Mr. Orejuela recounts only those portions of the evidentiary hearing testimony that are relevant to the Court's determination of whether his Miranda rights were violated.

#### 1. Sgt. Joseph Spagnolo's Testimony

Sgt. Spagnolo testified that on February 18, 2007, he was called to the scene of the Fox Run

3

Shopping Center because of a shooting at Las Palmeras, a club. (Tr. 5). Sgt. Spagnolo testified that an unknown witness approached one of his troopers, and stated that the victim, who was walking through the parking lot without a shirt, had been shot in the foot. (Tr. 8). Sgt. Spagnolo testified that he located the victim and saw that he had been shot in the foot, and that the victim was transported to Christiana Hospital. (Tr. 8).

Sgt. Spagnolo testified that there were several shell casings and an intact round from a .45 caliber automatic weapon at the scene. (Tr. 9). Sgt. Spagnolo testified that the suspect's vehicle description was a black Acura with a temporary tag and broken window. (Tr. 9).

Sgt. Spagnolo testified that officers tracked the temporary tag number and discovered the owner's name and address. (Tr. 16). Sgt. Spagnolo testified that officers were dispatched to the address, and the suspect's vehicle was parked in front of the address. (Tr. 18).

Sgt. Spagnolo testified that he remained at the Fox Run Shopping Center, and that Sgt. John Dial advised him that "he had a premise set up on the residence [,] and that at some point in time . . . somebody from the residence had come out of the residence, got into the car and responded back into the residence." (Tr. 19). Sgt, Spagnolo testified that he subsequently arrived at the scene, "simply knocked on the door[,] and made contact with the residents there." (Tr. 20). Sgt. Spagnolo testified that his officers were on the perimeters to back him up. (Tr. 20).

Sgt. Spagnolo testified that the "boyfriend of the mother" answered the door, "with the mother right behind him," and that he advised them that he was investigating an incident that occurred at Fox Run Shopping Center. (Tr. 21). Sgt. Spagnolo testified that they allowed him to come in, and that he was supported by other officers. (Tr. 22).

Sgt. Spagnolo testified that he asked if anyone was in the basement, was advised yes, and

4

ordered the two people to come up from the basement. (Tr. 23). Sgt. Spagnolo testified that after the individuals were secured, he further advised the mother's boyfriend that the vehicle parked in front of the residence was involved in the incident at Fox Run Shopping Center. (Tr. 23). Sgt. Spagnolo testified that the boyfriend responded that Mr. Orejuela was upstairs in the bedroom, and that he was the one that drove the vehicle that night. (Tr. 23). Sgt. Spagnolo testified that Mr. Orejuela's mother and boyfriend called him downstairs, and he came out accordingly. (Tr. 24).

Sgt. Spagnolo testified that Mr. Orejuela was patted down and brought to the main living area. (Tr. 24-25). Sgt. Spagnolo testified that Mr. Orejuela was not handcuffed, and he asked him in English if he had been driving the vehicle that was outside. (Tr. 25-26). Sgt. Spagnolo testified that Mr. Orejuela said, "yes," and he asked Mr. Orejuela in English if he had been at Fox Run Shopping Center. According to Sgt. Spagnolo, Mr. Orejuela said, "yes," and he had Corporal Jones handcuff him. (Tr. 25-26). Sgt. Spagnolo testified that after Mr. Orejuela was handcuffed, he read him his <u>Miranda</u> warnings in English. (Tr. 26-27). Sgt. Spagnolo testified that Mr. Orejuela understood his rights, and agreed to speak with him at the location. (Tr. 28-29).

Sgt. Spagnolo testified that he conducted the interview in English, and Mr. Orejuela stated that he was involved in a fight with the victim that spilled into the parking lot. (Tr. 30). Sgt Spagnolo testified that Mr. Orejuela stated that he was able to get into his car, but the victim approached him in a threatening manner, and he fired the gun several times into the ground in front of the victim to scare him away. (Tr. 30). Sgt. Spagnolo testified that Mr. Orejuela stated that he threw the gun out of the passenger window as he was fleeing the scene, and, "as best he could describe to me . . . described the location [of the gun] on Route 40 . . . ." (Tr. 30-31).

Sgt. Spagnolo testified that Mr. Orejuela's mother consented to a search of the black Acura

and residence, and that Mr. Orejuela was transported to Troop 2 for a more in-depth interview. (Tr. 31-32). Sgt. Spagnolo testified that a search of the vehicle and home did not produce a weapon. (Tr. 32).

On cross-examination, Sgt. Spagnolo testified that Mr. Orejuela was instructed to come downstairs with his hands up in the air, and that there were six officers in the area of the stairs with their weapons drawn. (Tr. 37). Sgt. Spagnolo testified that, based on the detailed call for a service report, "it may be accurate" that Mr. Orejuela was almost immediately arrested upon the officers' entry in the residence. (Tr. 53-55). Sgt. Sganolo also testified that Mr. Orejuela did not sign any written Miranda warnings, and that he did not take any notes when he took Mr. Orejuela's statement at the residence. (Tr. 44, 56).

### 2. John Penrod's Testimony

Detective Penrod testified that he reported to the Fox Run Shopping Center and interviewed a "Ms. Ptak." (Tr. 60). According to Detective Penrod, Ms. Ptak described the shooter as a Hispanic male in his 20s to 30, approximately 5'6 to 5'7, wearing a horizontal striped black, gray and white shirt. (Tr. 61). Detective Penrod testified that Ms. Ptak also provided the suspect's vehicle tag number. (Tr. 62).

Detective Penrod testified that he subsequently interviewed Mr. Orejuela at the State Police Barracks, and that Trooper Alberto Garcia was present. (Tr. 63, 66). Detective Penrod testified that he was not aware of any prior statements made by Mr. Orejuela, and that he initiated the interview by introducing himself to Mr. Orejuela and reading his Miranda rights in English. (Tr. 64).

Detective Penrod testified regarding a videotape of the interview, which was conducted in English. (Tr. 66). Detective Penrod testified that Mr. Orejuela's clothing and appearance matched

6

Ms. Ptak's description.

### 3. **Jeremy Nye's Testimony**

Mr. Nye, the boyfriend of Mr. Orejuela's mother, testified that on February 18, 2007, officers arrived at the home of Mr. Orejuela's mother. (Tr. 98). Mr. Nye testified that she allowed eight to ten officers into her home as he was simultaneously coming down the stairs. (Tr. 98). Mr. Nye testified that the officers, who had weapons drawn, told him to put his hands in the air and to come down the stairs. (Tr. 99).

Mr. Nye testified that the officers informed Mr. Orejuela's mother that they were looking for her brother, and that he told the officers that he was in the basement. (Tr. 99). Mr. Nye testified that the officers asked him to call the individuals in the basement upstairs, and that they were brought upstairs. (Tr. 99-100). Mr. Nye testified that the officers had their guns drawn on the individuals, and asked them to put their hands in the air, which he repeated to them in Spanish. (Tr. 100). Mr. Nye testified that the individuals were sent into the dining room. (Tr.100).

Mr. Nye testified that he told Mr. Orejuela's mother in Spanish that the officers were looking for Mr. Orejuela, and that he told the officers that he was upstairs. (Tr. 101). Mr. Nye testified that the officers asked him to call him downstairs, which he did, and that Mr. Orejuela subsequently began to come downstairs. (Tr. 101). Mr. Nye testified that the officers pointed their weapons at Mr. Orejuela and told him to put his hands in the air. (Tr. 101). Mr. Nye testified that he repeated the officers' command in Spanish to make sure that Mr. Orejuela understood it.

Mr. Nye testified that Mr. Orejuela came downstairs, and that the officers grabbed him, frisked him and handcuffed him. (Tr. 102, 104). Mr. Nye testified that the officer seated Mr. Orejuela in the living room, and that one of the officers asked, "[y]ou know why we're here?" (Tr.

7

102). Mr. Nye testified that Mr. Orejuela nodded, and that the officer said, "[y]ou were involved in an altercation at a night club?" (Tr. 102). Mr. Nye testified that Mr. Orejuela responded, "[y]eah." (Tr. 102.).

Mr. Nye testified that the officers began to question Mr. Orejuela about the altercation, including whether he had the weapon at the time. (Tr. 103). Mr. Nye testified that Mr. Orejuela responded that he had the weapon, but it was not in the house, and informed the officers about the weapon's location. (Tr. 103).

Mr. Nye testified that he did not hear any police officer provide Mr. Orejuela with Miranda warnings, and that he was approximately 12 feet away from Mr. Orejuela. (Tr. 104-06). On cross-examination, Mr. Nye testified that he was upset when the police arrived because Mr. Orejuela previously told him that he was involved in an altercation at the club. (Tr. 106).

### III. ARGUMENT

**A. Mr. Orejuela's Statements Were Obtained In Violation of His Fifth Amendment Rights.**

The Fifth Amendment of the United States Constitution protects a citizen from being "compelled in any criminal case to be a witness against himself." US CONST. Amend. V. See also United States v. DeSumma, 272 F.3d 176 (3d Cir. 2001) (noting that the Fifth Amendment bars the prosecution from using compelled testimony in its case in chief because the failure to administer Miranda warnings creates a presumption of compulsion, and even unwarned, voluntary statements are excluded from evidence). In Miranda, the Supreme Court defined custodial interrogation as "questioning by law enforcement officers after a person has been taken into custody or deprived of his freedom of action in any significant way." Id. at 444.

The Court premised this rule on the proposition that custodial interrogation is inherently coercive, and individuals subject to that form of questioning must be independently protected against intrusions on their rights. Id. at 533; see also Rhode Island v. Innis, 446 U.S. at 301 ("[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.").

"In determining whether an individual [is] in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint in freedom of movement' of the degree associated with a formal arrest.'" Stansbury v. California, 511 U.S. 318 (1994) (quoting California v. Beheler, 463 U.S. 1121 (1983)) (stating that the initial determination of custody depends on objective circumstances and not, on the subjective views of the interrogating officers or the person being questioned); see also Berkemer v. McCarty, 468 U.S. 420 (1984) (stating that the relevant inquiry is how a reasonable person in the suspect's position would have understood his situation); Rhode Island v. Innis, 446 U.S. at 300-01 (1980) (". . . Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."); United States v. Jacobs, 431 F.3d 99 (3d Cir. 2005) (stating that if Miranda warnings are not given before a person is in custody, evidence resulting from the questioning must be suppressed).

In Jacobs, the Third Circuit explained that:

> [T]here are at least three differently worded tests for when a person is in custody: (1) when the person has been deprived of her or his freedom in some significant way; (2) when a reasonable person would perceive that she or he was not at liberty to terminate the interrogation and leave; and (3) when there is a restraint on the person's freedom of movement of the degree associated with a formal arrest.

9

Id. at 105. The Court further noted that three factors should be weighed to determine if an individual is in custody:

> One is the location of the questioning. We have stated that 'all 'station house' interrogations should be scrutinized with extreme care for any taint of psychological compulsion or intimidation because such pressure is most apt to exist while a defendant is interviewed at a police station. A second factor is the information known by the officer concerning the suspect's culpability. 'The more cause for believing the suspect committed the crime, the greater tendency to bear down in interrogation and create the kind of atmosphere of significant restraint that triggers Miranda and vice versa.' And a third factor is whether the officer revealed his or her belief that the suspect was guilty.

Id. at 105 (quoting Stansbury v. California, 511 U.S. at 325 ("An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned."); see also Missouri v. Seibert, 542 U.S. 600, 609 (2004) (addressing the police tactic of beginning custodial interrogations without Miranda warnings, and then providing the warnings mid-stream to effectuate a waiver of rights, and stating that "failure to give the prescribed [Miranda] warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained."); United States v. Willaman, 437 F.3d 354, 359-60 (3d Cir. 2006) (identifying the additional factors of the length of the interrogation, whether the officers used coercive tactics such as hostile tones of voice, the display of weapons and whether the suspect voluntarily submitted to questioning);

Thus, in order to obtain legally admissible statements during custodial interrogation, the interrogating officers must apprise the party subject to questioning of the Miranda rights to counsel and silence, and secure a waiver of those rights before continuing questioning. Id. This waiver must be given "voluntarily, knowingly and intelligently," and the government bears the burden of proving compliance with the procedural safeguards. Id. at 444; see also, Frazier v. Cupp, 394 U.S. 731, 739

(1969) (stating that courts must examine the totality of the circumstances to determine the voluntariness of self-incriminating statements).

Here, the record demonstrates that Mr. Orejuela was almost immediately taken into custody and questioned by law enforcement officers, who knew that he was their suspect based on a description and confirmation from his mother's boyfriend that he had driven the vehicle. Indeed, the officer's initial questions, which were asked after Mr. Orejuela had been secured for safety, was whether he knew why the officers were there, and if he was involved in the altercation at the nightclub. Instead of immediately questioning Mr. Orejuela about his involvement in the altercation and shooting, the officers should have administered his Miranda warnings.

Additionally, there is no evidence, including officer notes, to support the officer's testimony that he administered Miranda warnings at the home, and Mr. Nye's testimony directly contradicts the officer's testimony. Here, the officers had significant cause to believe that Mr. Orejuela committed the suspected crime, and at least six officers immediately took him into custody with weapons drawn, creating "the kind of atmosphere of significant restraint that triggers Miranda . . . ." See Jacobs, 431 F.3d at 105. In light of this coercive environment, where Mr. Orejuela's ability to exercise his free will was undermined, any statements, including the second statement made at the police station, must be suppressed. See e.g., United States v. Naranjo, 426 F.3d 221 (3d Cir. 2005), (noting that postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken, and that such curative measures should be designed to ensure that a reasonable person in the suspect's position would understand the import and effect of the Miranda warning and of the waiver, including whether the suspect was informed that the prior unwarned statement cannot be used as evidence).

### B. The Gun, Which Was Obtained After A Violation Of Mr. Orejuela's Miranda Rights, Must Be Suppressed.

Generally, evidence obtained as a result of a constitutional violation is suppressed because it is "fruit of the poisonous tree." Oregon v. Elstad, 470 U.S. 298 (1985). Although the Supreme Court has determined that the failure to give a suspect Miranda warnings does not require suppression of the physical fruits of a suspect's statements, such physical evidence may be suppressed if the statements were involuntary and unconstitutional under the Fifth Amendment. See United States v. Patane, 542 U.S. 630 (2004). Thus, in the context of Fifth Amendment violations, "coercive police activity is a necessary predicate to the finding that a [statement] is not 'voluntary.'" Colorado v. Connelly, 479 U.S. 157, 167 (1986). Here, where Mr. Orejuela's statements where involuntary and unconstitutional, the gun, which was discovered as a result of his statements, should be suppressed.

## IV. **CONCLUSION**

For the foregoing reasons, the Court should exclude the Government's admission, at trial, of any and all statements that were obtained in violation of Mr. Orejuela's Fifth Amendment rights, including physical evidence seized as a result of those statements.

Respectfully submitted,

 /s/ Edson A. Bostic
Edson A. Bostic, Esquire
Federal Public Defender

Tieffa N. Harper
Research & Writing Attorney

Attorneys for Cristian Orejuela

Federal Public Defender's Office
District of Delaware
704 King Street, Suite 110
Wilmington, Delaware  19801
(302) 573-6010
ecf_de@msn.com

Dated: August 13, 2007