IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) Criminal Action No. 07-38-JJF |
| CRISTIAN OREJUELA | ) |
| aka Christian Munoz, | ) |
| | ) |
| Defendant. | ) |

**GOVERNMENT PRE-HEARING RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS**

**NOW COMES** the United States of America, by and through its undersigned attorneys, and hereby responds to Defendant's Motion to Suppress Physical Evidence and Statements, and respectfully requests that this Court deny the Motion for the reasons that follow:

**I.     Introduction**

On March 15, 2007, the federal grand jury for the District of Delaware returned a one count Indictment, which charged that, on February 18, 2007, the defendant, Cristian Orejuela, was an illegal alien in possession of a firearm, in violation of 18 U.S.C. § 922(g)(5). On May 10, 2007, the defendant filed a Motion to Suppress Physical Evidence and Statements. An evidentiary hearing on this Motion was held before this Court on July 10, 2007.

**II.    Proposed Findings of Fact**

On February 18, 2007, at approximately 12:50 am, police received a report of a shooting in the parking lot outside a dance club called Las Palmeras, located in the Fox Run Shopping Center in Bear, Delaware. *See* Dispatch Tape, Gov't Exhibit 1. Detectives from the Delaware State Police arrived on the scene shortly thereafter and found that the victim of the shooting had been hit with a bullet in the foot. Suppression Hearing Transcript ["Supp. Tr."] at 8. Police interviewed witnesses

at the scene, and obtained a tag number and description of the shooter's vehicle as a older model, black Acura. Supp. Tr. 7-9; Gov't Ex. 1. Police were able to locate a vehicle with matching tags and description registered to Nubia Munoz at 2 Candlewick Court, New Castle, Delaware. Supp. Tr. 16-17; Gov't Ex. 1. A witness further reported that the black Acura had its back windshield shattered during the course of its flight from the scene of the shooting. Supp. Tr. 9; Gov't Ex. 1. Witnesses, moreover, described the shooter as a Hispanic male. Gov't Ex. 1.

Based on this information, two officers went to 2 Candlewick Court, New Castle, Delaware and saw a black Acura, with a shattered back windshield, and matching temporary tags parked directly in front of this residence. Supp. Tr. 18. The officers maintained surveillance of the house, but did not enter until the arrival of additional units.

Meanwhile, at approximately 2:15 a.m., Detective Joseph Penrod interviewed a witness at the scene of the shooting who provided a detailed description of the shooter as a Hispanic male, approximately 5 foot 6 or 7 inches tall, wearing a striped, black gray and white shirt. Supp. Tr. 61-62.

At approximately 4:30 a.m., Sergeant Joseph Spagnolo knocked on the front door of the residence, which was answered by the defendant's mother, Nubia Munoz, and her boyfriend, Joseph Nye. Supp. Tr. 20. Ms. Munoz and Mr. Nye gave consent for the officers to enter the residence and Ms. Munoz subsequently signed a written consent to search the house and the vehicle. Supp. Tr. 21; Consent Form, Gov't Ex. 2.

Mr. Nye indicated that the defendant was upstairs and told the officers that he had been driving the black Acura earlier that night. Supp. Tr. 23-24. Ms. Munoz and Mr. Nye called for the defendant to come downstairs, and when he appeared at the top of the stairs, officers ordered him

to put his hands above his head. One officer went up the stairs and patted the defendant down, and then escorted him to the main living room. Supp. Tr. 25. Because the defendant was suspected of a shooting, the officers at the bottom of the stairs had their service weapons drawn. Supp. Tr. 37. The defendant's clothing and appearance matched the description given by witnesses at the scene. Supp. Tr. 67; *see* Videotape, Gov't Ex. 3 (showing the defendant, a hispanic male, dressed in a black, gray, and white striped shirt).

Sgt. Spagnolo asked the defendant whether he had been driving the Acura and whether he had been at the Fox Run Shopping Center earlier that night, and the defendant gave affirmative answers to both questions. Supp. Tr. 25-26. The defendant was then handcuffed and Sgt. Spagnolo gave the defendant the *Miranda* warnings. Supp. Tr. 26. Sgt. Spagnolo read the *Miranda* warnings to the defendant one at a time, and had the defendant explain in his own words what each warning means. Supp. Tr. 27. The defendant acknowledged that he understood each right and also gave appropriate explanations demonstrating that he understood each right.[1] Supp. Tr. 28. After receiving the warnings, the defendant agreed to speak with the officers, Supp. Tr. 29, and gave a statement in which he admitted to shooting the firearm into the ground, and to throwing the firearm out his car window. Supp. Tr. 30-31. Following the interview, the defendant was taken to the Delaware State Police, Troop 2, headquarters, and a consent search was conducted of the house and the vehicle during which no physical evidence was recovered. Supp. Tr. 32.

---

[1] Mr. Nye testified that he did not hear the *Miranda* warnings administered. Supp. Tr. 104. Sgt. Spagnolo acknowledged that he as the defendant two questions immediately prior to handcuffing him, moving him to the couch, and then given the warnings. Even if this Court finds Mr. Nye's testimony credible, however, his failure to hear or recall the administration of the warnings is not surprising given the number of other people in the house, the circumstances of the evening, and the distance between Mr. Nye and Sgt. Spagnolo. *See* Supp. Tr. 108.

At headquarters, the defendant was interviewed by Detective John Penrod in the presence of Task Force Officer Alberto Garcia. Neither officer had been present earlier at the residence, and Detective Penrod was unaware of any prior statement by the defendant. Supp. Tr. 63-64, 67. After the defendant stated that he speaks English, Detective Penrod administered the *Miranda* warnings. Supp. Tr. 64; Gov't Ex. 3. The defendant acknowledged that he understood each right, and then gave a post-*Miranda*, videotaped statement in which he admitted that he had been in a physical altercation with the victim, that he had shot him, and that he threw the firearm out the car window along Route 40. The defendant claimed he was acting in self defense and that he shot at the ground. Gov't Ex. 3.

A significant fraction of the interview was devoted to determining the exact location of the firearm. Gov't Ex. 3. The area of Route 40 along which the defendant discarded the firearm is a busy, residential area with automobile and pedestrian traffic and bus stops. Supp. Tr. 68-69. At the time of the interview with Detective Penrod, officers had already attempted, unsuccessfully, to locate the weapon. Supp. Tr. 69.

After the interview with the defendant was completed, Delaware State Police found the gun on the shoulder of Route 40, at approximately the location described by the defendant. Supp. Tr. 69-70. The firearm was a loaded .45 caliber handgun, and was set in single-action mode, meaning that the weapon was ready to be fired with only minimal pressure on the trigger. Supp. Tr. 71.

Having determined that the defendant was an alien and here illegally, he was interviewed by Special Agent Michael Deshaies of the Bureau of Immigration Customs Enforcement on March 9, 2007. Supp. Tr. 82. Special Agent Deshaies gave the defendant the *Miranda* warnings in Spanish and had the defendant execute a written Spanish language waiver of his *Miranda* rights. Supp. Tr.

83-84; Gov't Ex. 4. The defendant then gave a sworn statement, in which he admitted to being a citizen of Columbia, and admitted to getting a pistol out of his car and shooting it at the victim. He claimed, however, that he was trying to defend himself and that he shot the gun into the ground. Supp. Tr. 87-88.

### III. Proposed Conclusions of Law

The defendant contends that the firearm and other evidence should be suppressed because the police lacked probable cause to arrest him, and lacked a search or arrest warrant permitting entry into the residence at 2 Candlewick Court. He also claims that he was interviewed by the police without receiving or understanding his *Miranda* rights and asks this Court to suppress statements on that basis. For the reasons that follow, these arguments are each without merit.

#### A. *The Entry Into the House Was Consensual and the Police Had Probable Cause to Arrest the Defendant Once Inside.*

As a threshold matter, no warrant was required for the police to enter the house because Ms. Munoz and Mr. Nye voluntarily consented to the entry, as evidenced by the written consent to search form executed by Ms. Munoz.[2] *See Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); *United States v. Matlock*, 415 U.S. 164, 170-71 (1974).

---

[2] Even if the entry into the home were not valid, so long as there was probable cause to arrest the defendant, then his statements at police headquarters and to Special Agent Desheais would be admissible. *See New York v. Harris*, 495 U.S. 14, 20 (1990) (refusing to suppress statements made by the defendant at the station house after police entered the defendant's home without a warrant and arrested him, finding that "[t]he warrant requirement for an arrest in the home is imposed to protect the home, and anything incriminating the police gathered from arresting Harris in his home, rather than elsewhere, has been excluded . . . . We are not required by the Constitution to go further and suppress statements later made by Harris"). Similarly, the gun, which was recovered on the public roadway would also not be suppressed. There was no physical evidence recovered from the defendant's house.

5

Once inside the house, and after speaking with Ms. Munoz and Mr. Nye, the officers had probable cause to arrest the defendant. The description of the shooter given by eyewitnesses was consistent with the defendant; the black Acura used to flee the scene of the shooting was parked outside the house; and Ms. Munoz and Mr. Nye told the officers that the defendant had been driving that car earlier in the evening.[3] *See Government of Virgin Islands v. Williams*, 739 F.2d 936, 939 (3d Cir. 1984) (finding probable cause to search vehicle where police investigating a burglary saw a yellow Mazda with matching license plate, driven by a Hispanic male wearing a blue and white checkered shirt thirty minutes after receiving a matching description of the burglary suspect and his car); *see also United States v. Street*, 472 F.3d 1298, 1305 (11th Cir. 2006) (probable cause where tag number matched car defendant had rented earlier that morning and defendant matched physical description of bank robber).

At any rate, the use of handcuffs for officer safety was appropriate while the consent search of the house was being conducted considering that the defendant was suspected of shooting another individual a few hours earlier. *See Torres v. United States*, 200 F.3d 179, 187 (3d Cir. 1999) (permitting the handcuffing of residents during the duration of a search of the house where officers have reason to be concerned for their safety).

---

[3]Detective Joseph Penrod had conducted an interview with an eye witness prior to the defendant's arrest, in which the shooter was described as a Hispanic male, approximately 5 foot 6 or 7 inches tall, wearing a striped, black gray and white shirt. Supp. Tr. 61-62. While Detective Penrod did not communicate this information to the officers at the residence at that time, it can nevertheless be considered as part of the probable cause determination under the collective knowledge doctrine. *See Illinois v. Andreas*, 463 U.S. 765, 772 n. 5 (1983); *United States v. Belle*, 593 F.2d 487, 497 n. 15 (3d Cir.1979), *see also Cuvo v. De Biasi*, 169 Fed. Appx. 688, 690 (3d Cir. 2006) (not precedential opinion). The officers, at minimum, knew from the radio dispatch that the shooter was a Hispanic male. *See* Gov't Ex. 1.

### B. *The Defendant Received and Understood the* Miranda *Warnings and Voluntarily Agreed to Speak with Police.*

The *Miranda* warnings were administered to the defendant first by Sgt. Spagnolo at the house, then by Detective Penrod at police headquarters, and a third time by Special Agent Deshaeis. On all three occasions, the defendant acknowledged that he understood his rights and voluntarily agreed to speak with the police about the evening's events.

The warnings were given by both Sgt. Spagnolo and Detective Penrod in English, however, the record is replete with evidence demonstrating that the defendant is proficient in the English language and that he understood the *Miranda* warnings. Sgt. Spagnolo testified that he gave the warnings individually and that when asked, the defendant was able to appropriately explain in his own words the significance of each right. *See* Supp. Tr. 28. Sgt. Spagnolo conducted the interview with the defendant entirely in English. At the police station, the defendant acknowledged that he speaks English, although he claimed not to read and write it. After Detective Penrod administered the *Miranda* warnings, the defendant confirmed that he understood his rights and wanted to tell his side of the store.[4] *See* Supp. Tr. 64; Gov't Ex. 3. The nearly thirty minute interview with Detective Penrod was also conducted entirely in English, notwithstanding the presence of Officer Garcia, who is Spanish speaking.[5] These circumstances made apparent that the defendant understood the

---

[4]On cross-examination of Detective Penrod, defense counsel explored the precise form of the warnings administered by Detective Penrod. The Supreme Court has held, however, that "no talismanic incantation [is] required to satisfy [*Miranda*'s] strictures," and that "[t]he inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by Miranda.'" *Duckworth v. Eagan*, 492 U.S. 195, 202-03 (1989) (quoting *California v. Prysock*, 453 U.S. 355, 359, 361 (1981) (per curiam)). The warnings given by Detective Penrod satisfied this standard and reasonably conveyed the *Miranda* rights.

[5]There was a brief exchange in Spanish between the defendant and Officer Garcia at the beginning of the interview, in which the defendant asks whether it would be easier to tell his story

7

warnings in English and could therefore voluntarily and knowingly waive his rights and agree to speak with Sgt. Spagnolo and later with Detective Penrod.[6]

### C. The Two Pre-Miranda Questions Do Not Require Suppression of Subsequent Statements Under Elstad and Seibert.

When the police first encountered the defendant at his house, Sgt. Spagnolo asked him two questions about his whereabouts that evening. He was then handcuffed and mirandized. After agreeing that he understood each right, he gave a voluntary statement detailing his version of what occurred earlier in the evening. Later, at police headquarters, the defendant was interviewed by Detective Penrod and Officer Garcia, neither of whom had been present at the house. He again received the *Miranda* warnings, agreed that he understood each right, and gave a voluntary statement. A third interview was conducted approximately three weeks later, by Special Agent Deshaeis in which the defendant repeated his version of events after receiving the *Miranda* warnings in Spanish.

The Government concedes that the defendant's responses to the two initial questions were given without the benefit of the *Miranda* warnings. However, the defendant's subsequent statements — at the house, at the police headquarters, and to Special Agent Deshaies — were given after full and careful administration of the *Miranda* warnings, and therefore are admissible. *See Oregon v. Elstad*, 470 U.S. 298 (1985). Indeed, the facts of this case are closely analogous to the facts of *Elstad*. In *Elstad*, the police went to a burglary suspect's house to take him into custody. Before the

---

in Spanish. Officer Garcia told the defendant that he should try first in English, and the defendant proceeded for the remainder of the interview entirely in English. *See* Gov't Ex. 3.

[6]Special Agent Deshaeis administered the warnings in Spanish and the defendant executed a Spanish language *Miranda* waiver form. Supp. Tr. 83-84.

arrest, a police officer spoke briefly with the suspect, who acknowledged, in response to questioning, that he knew the victim and that he had been at the scene. The suspect was then taken back to the station house, and gave a full confession after receiving the *Miranda* warnings. *Id.* at 301-02. The Supreme Court refused to suppress the subsequent, post-*Miranda* statement, holding:

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Id.* at 309.

The Supreme Court in *Missouri v. Seibert*, 542 U.S. 600 (2004), has since created a limited exception to *Elstad* where police engage in a "strategy" to undermine *Miranda* by employing a "two-step" interrogation technique, in which the police first elicit a pre-*Miranda* confession in a manner that is "systematic, exhaustive, and managed with psychological skill," and only then administer the *Miranda* warnings and seek the same admissions. *Id.* at 616. In *Seibert*, the police interrogated the defendant at length prior to Mirandizing her, and then, with only a short break, elicited nearly identical confession. *Id.* at 616-17. The Supreme Court suppressed the pre and post-*Miranda* statements in that case.

Justice Kennedy, who supplied the fifth concurring vote in *Seibert*, set forth the controlling test, and held that *Elstad* continues to permit the admission of the second, post-*Miranda* statement unless the police employ a two-step interrogation technique "in a calculated way to undermine the *Miranda* warning." *See United States v. Naranjo*, 426 F.3d 221, 232 (3d Cir. 2005) ("[U]nless the agents deliberately withheld warnings, *Elstad* controls . . . .").

The evidence shows that, unlike the officers in *Seibert*, Sgt. Spagnolo did not engage in a calculated attempt to undermine the *Miranda* warnings by asking the defendant two brief pre-*Miranda* questions, which merely established that the defendant was the driver of the car and had been present at the scene. The questioning was not extensive nor detailed. Once the defendant was formally arrested and placed in handcuffs, Sgt. Spagnolo immediately and carefully administered each of the *Miranda* rights, asking the defendant to give an example of each right. Sgt. Spagnolo's actions were plainly not intended to undermine *Miranda*.

With regard to Detective Penrod's interview of the defendant, it is even clearer that there the two initial questions were not part of a "strategy" to undermine *Miranda*. Indeed, such a strategy could hardly have been possible since Detective Penrod was not even aware of the defendant's prior statement at the time of the interview. Supp. Tr. 63-64, 67. Similarly, Special Agent Deshaeis had only limited knowledge of the state investigation, and conducted his interview weeks later with regard to immigration and federal charges.

Even if the police did purposefully employ such a two-step interrogation technique, the defendant's subsequent statements can nevertheless be admitted if "curative measures are taken before the postwarning statement is made" which are "designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Seibert*, 542 U.S. at 622 (Kennedy, J. concurring). Justice Kennedy noted that a "substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn." *Id.* Such curative measures were taken with regard to the station house interview and the interview with Special Agent Deshaeis.

10

At the police station, Detective Penrod administered a fresh set of *Miranda* warnings, after the passage of time, in a new physical setting. Neither Detective Penrod nor Officer Garcia had been present at the house, nor were they aware of any prior statement given by the defendant, as is evident from the videotape of the interview, *see* Gov't Ex. 3. The separation of time, location, and personnel was even more pronounced by the time the defendant was interviewed by Special Agent Deshaeis, nearly three weeks after the defendant's arrest. The interview with Special Agent Deshaeis was also accompanied by fresh *Miranda* warnings, including a written *Miranda* waiver form, and occurred at ICE headquarters. Special Agent Deshaeis had only limited knowledge of the prior investigation, and was focused on the defendant's alienage, immigration status, as well as regarding possible federal firearms offenses.

As Sgt. Spagnolo did not deliberately attempt to undermine the *Miranda* warnings, *Elstad* should control and permit the admission of each of the defendant's voluntary, post-*Miranda* statements. But even under the second step of the *Seibert* analysis, the defendant's police headquarters statements and statements to Special Agent Deshaeis should be admitted because the substantial break in time, circumstances, and personnel, combined with the administration of fresh *Miranda* warnings were sufficient to permit the defendant to appreciate the import of the *Miranda* rights and to give a knowing and voluntary waiver of them. *See Seibert*, 542 U.S. at 622 (Kennedy, J. concurring).

### C. *The Defendant's Responses to Questions Relating to the Location of the Firearm Are Admissible Even in the Absence of the Miranda Warnings.*

*Miranda* does not apply to the questions and responses regarding the whereabouts of the firearm under the public safety exception recognized in *New York v. Quarles*, 467 U.S. 649, 656

(1984) (refusing to require *Miranda* warnings when "police officers ask questions reasonably prompted by a concern for the public safety."). In *Quarles*, the officers apprehended an armed suspect after he ran into a supermarket and asked him where he put the gun. *Id.* at 651-52. Even though the suspect was handcuffed and posed no threat to the officers when questioned, the Supreme Court held that the interrogation regarding the whereabouts of the firearm was permissible because the gun created a clear danger to the public, holding that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.* at 657.

In this case, the officers were attempting to locate a loaded firearm. Give that the defendant had disposed of the weapon by throwing it onto the shoulder of a busy stretch of residential highway, there was a clear danger to public safety and thus, *Miranda* did not apply to the questioning relating to the firearm's whereabouts. *See* Supp. Tr. 68-69 ("[W]e had an idea that [the firearm] was discarded out of a vehicle while the suspect fled from the scene. And we were concerned for the public safety [that] the loaded firearm may be on the street somewhere.").

### D. *The Firearm Itself Would Not Be Subject To Suppression Even If Found as a Result of a Miranda Violation.*

Even if, *arguendo*, a *Miranda* violation occurred, the firearm should not be suppressed. The "fruit of the poisonous tree" doctrine does not apply to physical evidence recovered as a result of a voluntary statement taken in violation of *Miranda*. *United States v. Patane*, 542 U.S. 630, 636-37 (2004). In *Patane*, officers went to the defendant's residence to investigate a violation of a restraining order and illegal possession of a firearm. *Id.* at 634-35. During the course of police questioning, the defendant told the officers where the firearm was located. Even though the Court

12

found that *Miranda* was violated by the custodial interrogation of the defendant, the Court refused to suppress the firearm. *Id.* at 643-44; *see also United States v. DeSumma*, 272 F.3d 176, 180-81 (3d Cir. 2001) ("We hold that the fruit of the poisonous tree doctrine does not apply to derivative evidence secured as a result of a voluntary statement obtained before Miranda warnings are issued. Thus, even though the defendant's seized gun was secured as a result of his non-Mirandized statement, it was properly admitted."). As such the firearm, and other physical evidence is clearly admissible, without regard to *Miranda*.

### E. Questioning by Special Agent Deshaeis Did Not Implicate the Sixth Amendment.

Special Agent Deshaeis conducted an interview with the defendant on March 9, 2007. Prior to that time, the defendant was charged by Delaware state authorities with assault and attempted murder arising out of the shooting. Supp. Tr. 89. Special Agent Deshaies questioned the defendant about his immigration status, the circumstances surrounding entry into the United States, and his possession of the firearm on February 18, 2007. Supp. Tr. 87.

"The Sixth Amendment right [to counsel] . . . is offense specific" and "it does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings-whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991) (citations and internal quotation marks omitted). Accordingly, "a defendant's statements regarding offenses for which he had not been charged [are] admissible notwithstanding the attachment of his Sixth Amendment right to counsel on other charged offenses." *Texas v. Cobb*, 532 U.S. 162, 168 (2001). The Supreme Court has adopted the same test to determine the applicability of the Sixth Amendment as it applied in

*Blockburger v. United States*, 284 U.S. 299 (1932), to determine the scope of the Double Jeopardy clause: "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Cobb*, 532 U.S. at 173. So long as the questioning relates to a distinct, uncharged, offense under the *Blackburger* test, the Sixth Amendment does not apply.

When Special Agent Deshaeis conducted this interview, the defendant had not been indicted on the instant federal charge of possession of the firearm by an illegal alien, in violation of 18 U.S.C. § 922(g)(5). Even though the defendant had pending state charges arising out of the shooting, the Sixth Amendment had yet to attach to the federal firearms charges. Thus, under *Cobb*, the Sixth Amendment does not bar the admission of the defendant's statements to Special Agent Deshaeis in the instant prosecution.

**WHEREFORE,** the United States requests that the Court deny the defendant's Motion to Suppress Evidence and Statements.

>
> Respectfully submitted,
> COLM F. CONNOLLY
> UNITED STATES ATTORNEY
>
> BY:   /s/ Ilana H. Eisenstein
>       Ilana H. Eisenstein
>       Assistant United States Attorney

Dated: August 13, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Act. No. 07-38-JJF |
| | ) | |
| CRISTIAN OREJUELA aka Christian Munoz, | ) | |
| | ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

I, Jennifer Brown, an employee in the Office of the United States Attorney, hereby certify under penalty of perjury that on August 13, 2007, I electronically filed:

**GOVERNMENT'S PRE-HEARING RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS**

with the Clerk of Court using CM/ECF. Said document is available for viewing and downloading from CM/ECF, which will send notification of such filing(s) to the following:

Edson A. Bostic, Esquire
Federal Public Defender
District of Delaware
704 King Street, Suite 110
Wilmington, DE 19801

/s/Jennifer Brown
Jennifer Brown