IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,      :
                               :
          Plaintiff,           :
                               :
     v.                        :   Criminal Action No. 07-38-JJF
                               :
CRISTIAN OREJUELA, a/k/a       :
CRISTIAN MUNOZ,                :
                               :
          Defendant.           :
_____

Colm F. Connolly, United States Attorney, and Ilana E.
Eisenstein, Esquire, Assistant United States Attorney, of the
OFFICE OF THE UNITED STATES ATTORNEY, Wilmington, Delaware.

Attorney for Plaintiff.

Edson A. Bostic, Esquire, Federal Public Defender, of the FEDERAL
PUBLIC DEFENDER'S OFFICE, Wilmington, Delaware.

Attorney for Defendant.

_____

**MEMORANDUM OPINION**

September $\partial\mathcal{O}$, 2007
Wilmington, Delaware

Farnan, District Judge.

Pending before the Court is a Motion To Suppress Physical Evidence And Statements (D.I. 9) filed by Defendant, Cristian Orejuela.  For the reasons discussed, Mr. Orejuela's Motion will be granted in part, and denied in part.

## I.    BACKGROUND

On March 15, 2007, Defendant, Cristian Orejuela, was indicted on one count of possession of a firearm by an illegal alien, in violation of 18 U.S.C. §§ 922(g)(5).  Mr. Orejuela filed the instant Motion To Suppress (D.I. 9) seeking to exclude statements and physical evidence he alleges were obtained in violation of his Fifth Amendment rights.

By his Motion, Mr. Orejuela contends that law enforcement officers lacked probable cause to arrest him on February 18, 2007, and lacked a search or arrest warrant permitting entry into his mother's residence at 2 Candlewick Court, New Castle, Delaware.  Further, Mr. Orejuela contends that he was interviewed by law enforcement officers without receiving or understanding his <u>Miranda</u> rights, and therefore the Court should suppress all statements made by him prior to, during, and after his arrest, as well as any physical evidence obtained as a result of these statements.

The Court conducted an evidentiary hearing on July 10, 2007, and briefing on the hearing was completed on August 13, 2007.

1

Two Delaware State Police Officers testified at the hearing:
Sergeant Joseph J. Spagnolo ("Sergeant Spagnolo") and Detective
John Francis Penrod ("Detective Penrod"), as did Special Agent
Michael John DeShaies ("Special Agent DeShaies"), of the
Department of Homeland Security Immigration and Customs
Enforcement.  Jeremy Christopher Nye ("Mr. Nye") testified for
the Defendant.

## II.  FINDINGS OF FACT

1.   On February 18, 2007, at approximately 12:51 a.m.,
police received a report of a shooting in a parking lot outside a
dance club called Las Palmeras, located in the Fox Run Shopping
Center in Bear, Delaware.  (Gov't Exh. 1; Def. Exh. 8).

2.   Delaware State police officers arrived at the scene
shortly thereafter, and found that the victim of the shooting had
been hit with a bullet in the foot. (D.I. 18 ("Tr.") at 5-8, 58-
59).

3.   Sergeant Spagnolo arrived at the scene at approximately
1:00 a.m. (Tr. 5).  He observed several shell casings at the
scene, as well as an intact round from a .45 caliber automatic
weapon. (Tr. 9).

4.   Police interviewed witnesses at the scene, and obtained
a tag number and description of the shooter's vehicle: a black
Acura with temporary tags.  Witnesses further advised officers
that one of the Acura's windows had been shattered during the

2

incident. (Tr. 9).

     5.    The temporary tag number was registered to Nubia Munoz, the Defendant's mother, at 2 Candlewick Court, New Castle, Delaware. (Tr. 17).

     6.    The shooter was identified over the police radio dispatch as a Hispanic male. (Gov't Exh. 1).

     7.    Detective Penrod arrived at the scene at approximately 2:00 a.m. (Tr. 59).  He conducted an interview with an eyewitness, who described the shooter as a Hispanic male, approximately 5 foot 6 or 7 inches tall, wearing a horizontal-striped black, gray and white shirt. (Tr. 59-62).  Detective Penrod did not communicate this information to anyone at this time. (Tr. 62).

     8.    Two officers went to 2 Candlewick Court, New Castle Delaware ("the residence"), and located a black Acura with a shattered window parked directly in front of the residence. (Tr. 18).

     9.    Officers set up surveillance on the residence, and observed someone exiting the residence, searching through the vehicle, and returning to the residence. (Tr. 19).

     10.  Sergeant Spagnolo arrived at the residence at approximately 4:30 a.m.  (Tr. 20, Def. Exh. 3).

11.   Upon arrival,[1] Sergeant Spagnolo knocked on the front door while somewhere between six to nine other police officers provided "back up" positions around the residence. (Tr. 20, 35-36, 98).

12.   Mr. Orejuela's mother, Nubia Munoz, and her boyfriend, Mr. Nye, answered the door, and allowed Sergeant Spagnolo and the officers providing "back up" entry into the residence. (Tr. 20-22, 98).

13.   Sergeant Spagnolo informed Ms. Munoz and Mr. Nye that the Acura registered to Ms. Munoz, parked in front of the residence, had been involved in an incident at the Fox Run Shopping Center.  (Tr. 23)  He asked who had driven the car that evening. (Tr. 23).

14.   Mr. Nye told Sergeant Spagnolo that Mr. Orejuela had been driving the car earlier that evening, and was upstairs. (Tr. 23-24).

15.   Mr. Nye and Ms. Munoz called Mr. Orejuela to come downstairs.  (Tr. 37).

16.   Sergeant Spagnolo's service weapon was not drawn; however, the other officers present had their service weapons

---

[1]While there are discrepancies between Sergeant Spagnolo's testimony and the Detail Call for Service Report (Def. Exh. 8) regarding the timing of Sergeant Spagnolo's arrival at the residence, the officers' entry into the residence, and Mr. Orejuela's arrest, the Court credits Sergeant Spagnolo's testimony.

drawn. (Tr. 35, 98-99, 101).

17.  An officer met Mr. Orejuela approximately a quarter of the way down the stairs, patted him down, and escorted him towards the main living area. (Tr. 24-25).

18.  Mr. Orejuela's clothing and appearance matched the description given to Detective Penrod by the eyewitness at the scene. (Tr. 67).

19.  Sergeant Spagnolo asked Mr. Orejuela whether he had driven the Acura parked outside that evening, and whether he had been at the Fox Run Shopping Center. Mr. Orejuela responded affirmatively to both questions. (Tr. 25).[2]

20.  Mr. Orejuela was handcuffed and given the Miranda warnings in English. Mr. Orejuela acknowledged and demonstrated his understanding of the Miranda warnings by explaining to Sergeant Spagnolo in English what each of the warnings meant. (Tr. 26-29).[3]

---

[2]Mr. Nye testified that Sergeant Spagnolo asked Mr. Orejuela the following questions: "You know why we're here?" and "You were involved in an altercation at a night club?" (Tr. 102).  The Court credits Sergeant Spagnolo's testimony, given the circumstances of the evening and the fact that Mr. Nye testified that he was upset when the police arrived because Mr. Orejuela had previously told him that he was involved in an altercation at the club. (Tr. 106-107).  In the Court's view, Mr. Nye's recollections could have been affected by the police presence concerning a matter Mr. Orejuela had told him about.

[3]Mr. Nye testified that he did not hear the Miranda warnings administered.  (Tr. 104-105).  The Court will credit the testimony of Sergeant Spagnolo, given: (i) the number of people in the house, including several police officers; (ii) that Mr.

21.  Mr. Orejuela agreed to speak with the officers, and Sergeant Spagnolo conducted an interview.  Mr. Orejuela admitted he had been involved in a fight with the victim, that he had shot a firearm into the ground in the direction of the victim, and that he had thrown the firearm out the passenger car window when he was fleeing the scene. (Tr. 29-30).

22.  Mr. Orejuela told Sergeant Spagnolo the approximate location where he had thrown the weapon along Route 40. (Tr. 30-31).  Mr. Orejuela was then taken to Delaware State Police Barracks, Troop 2. (Tr. 32).

23.  Sergeant Spagnolo took no notes during his interview with Mr. Orejuela. (Tr. 44).

24.  Ms. Munoz executed a written consent in Spanish to search the house and the vehicle. (Tr. 31-32; Gov't Exh. 2).  The residence and the vehicle were searched for the weapon, which was not located. (Tr. 32).

25.  At Troop 2, Mr. Orejuela was interviewed on videotape by Detective Penrod in the presence of Task Force Officer Alberto Garcia ("Officer Garcia"). (Tr. 63-65).

26.  Detective Penrod had not spoken with the officers involved in Mr. Orejuela's arrest, and was unaware of any prior

---

Nye admitted to being upset when the police arrived because Mr. Orejuela had informed him he had been involved in an alteration at the nightclub (Tr. 106-107); and (iii) that Mr. Nye was standing approximately 12 feet away from Sergeant Spagnolo (Tr. 106).

statements Mr. Orejuela had made. (Tr. 63-64).

27.   Mr. Orejuela responded affirmatively when Detective Penrod asked if he spoke English, but stated that he could not read English. (Tr. 64; Gov't Exh. 3).

28.   Detective Penrod administered the <u>Miranda</u> warnings in English. (Tr. 64-65; Gov't Exh. 3).  Mr. Orejuela acknowledged that he understood each right. (Gov't Exh. 3).

29.   Mr. Orejuela gave a statement in which he admitted to having been in an physical altercation with the victim, that he shot him, and threw the firearm used to shoot the victim out the car window along Route 40. (Gov't Exh. 3).

30.   Detective Penrod questioned Mr. Orejuela about the location of the firearm on Route 40.  Mr. Orejuela responded that he had thrown the firearm along a busy, residential area of Route 40, with pedestrian traffic and bus stops. (Tr. 68-69).

31.   Following Detective Penrod's interview of Mr. Orejuela, the firearm was located at the location described by Mr. Orejuela. (Tr. 69-70).

32.   The firearm was a semi-automatic .45 caliber handgun in single-action mode, meaning that the weapon was recently fired, and could be fired again using minimal pressure. (Tr. 70-71).

33.   Delaware State Police Detective Mary Bartowski later notified the Department of Homeland Security Immigration and Customs Enforcement that she had a case involving an alien. (Tr.

7

82).

34.   Agent DeShaies interviewed Mr. Orejuela on March 9, 2007 in Dover, Delaware at the Immigration and Customs Enforcement (hereinafter "ICE") Office.   Agent William Horn was also present at the interview.   The interview was conducted in Spanish. (Tr. 82).

35.   Agent DeShaies asked Mr. Orejuela his place of birth, how he entered the United States, and his current immigration status. (Tr. 83).   Mr. Orejuela informed Agent DeShaies that he did not have a current immigration status, that he had entered the United States as a visitor, and his Visa had expired. (Tr. 84).

36.   Agent DeShaies administered the <u>Miranda</u> warnings in Spanish, and Mr. Orejuela executed a Miranda Warning Declaration of Rights, in Spanish, indicating his understanding of his rights, and that he was refusing his right to an attorney. (Tr. 84-85).

37.   Mr. Orejuela gave a sworn statement in which he admitted his immigration status.   He also admitted to getting a pistol from his car and firing it at the ground towards the victim.   He admitted to throwing the pistol out of his car window on his drive home. (Tr. 87-88).

### III. CONCLUSIONS OF LAW

A.   <u>Whether The Entry into the Residence was Consensual</u>

38.   The warrantless entry of a person's home, whether to make an arrest or to conduct a search for specific objects, is generally prohibited by the Fourth Amendment.  <u>Illinois v. Rodriguez</u>, 497 U.S. 177, 181 (1990).  However, this prohibition does not apply when "voluntary consent has been obtained, either from the individual whose property is searched, or from a third party who possesses common authority over the premises.  <u>Id</u>. (internal citations omitted).

39.  The Court concludes that a warrant was not required for the police to enter and search the residence and the vehicle. Ms. Munoz, an occupant of the residence, and Mr. Nye allowed the police officers' entry into the residence. (Tr. 98).  Ms. Munoz, the owner of the vehicle and occupant of the residence, executed a Delaware State Police Consent to Search Form, in Spanish. (Gov't Exh. 2).

40.  Because the Court concludes that Ms. Munoz consented to the officers' entry and search of her residence and vehicle, Defendant's Motion to Suppress Physical Evidence and Statements will be denied as it pertains to this issue.

B.   <u>Whether There Was Probable Cause To Arrest Mr. Orejuela</u>

41.  Probable cause exists where the facts and circumstances within the arresting officer's knowledge are sufficient to lead a

reasonable person to believe that an offense has been committed. United States v. McGlory, 968 F.2d 309, 342 (3d Cir. 1992); see also Beck v. Ohio, 379 U.S. 89, 91 (1964).  Whether the police have probable cause for a warrantless arrest is determined by the totality of the circumstances.  Illinois v. Gates, 462 U.S. 213, 230-32 (1983).

42.  Reviewing the circumstances in this case, the Court concludes that probable cause existed for the police officers to arrest Mr. Orejuela at the residence of Ms. Munoz.  First, eyewitnesses to the crime reported that the shooter fled the scene in a black Acura, with a shattered window and a temporary tag, and a black Acura, with a shattered window and a tag matching the witnesses's report, was found parked in front of the Munoz's residence.   (Tr. 9, 18; Def. Exh. 10).  The Acura was registered to Ms. Munoz, an occupant of the residence. (Tr. 17, Def. Exh. 10).  Ms. Munoz and Mr. Nye informed the officers that Mr. Orejuela had been driving the Acura earlier that evening. (Tr. 23). Further, the physical description of the shooter from the radio dispatch was consistent with Mr. Orejuela's appearance at the Munoz's residence. (Gov't Exh. 1; Def. Exh. 3; Tr. 67). See Government of Virgin Islands v. Williams, 739 F.2d 936, 939 (3d Cir. 1984) (finding probable cause existed to search vehicle when defendant's license plate and physical appearance matched description of burglary suspect and his car).

43.  Because the Court concludes that the officers had probable cause to arrest Mr. Orejuela at the Munoz's residence, the Court will deny Defendant's Motion to Suppress Physical Evidence and Statements as it pertains to this issue.

C.  Whether Mr. Orejuela's Statements Were Obtained in Violation of His Fifth Amendment Rights

44.  The Fifth Amendment provides that "no person. . . shall be compelled in any criminal case to be a witness against himself. . . ."  The Supreme Court, in Miranda v. Arizona, 384 U.S. 436, 444-45 (1966), held:

> the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.  By custodial interrogation, we mean *questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.*  As for the procedural safeguards to be employed, unless other fully effective means are devised to inform the accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required.  Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.  The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.

Id. (emphasis added).  "Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."  Rhode Island v. Innis, 446 U.S. 291,

11

301 (1980).

45.   The term "interrogation" under <u>Miranda</u> refers not only to express questioning, but also to any words or actions that the police know are likely to elicit an incriminating response, or any response, inculpatory or exculpatory, that the prosecution may seek to introduce at trial.  <u>Id</u>. at 301-302.

46.   "A person is in custody when he either is arrested formally or his freedom of movement is restricted to the degree associated with a formal arrest.  For a person to be in custody when he has not been arrested, something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so."  <u>United States v. Willaman</u>, 437 F.3d 354, 359 (3d Cir. 2006)(internal citations omitted).

47.   Courts consider several factors when determining whether a person was in custody, including "(1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning." <u>Id</u>. at 359-360.

1.   *Mr. Orejuela's Pre-Miranda Statements to Sergeant Spagnolo*

48.   The Court concludes that Mr. Orejuela was subject to a custodial interrogation for purposes of Miranda when Sergeant Spagnolo initially questioned Mr. Orejuela. Mr. Orejuela's movements were restrained the moment he descended the stairs, as he was flanked by a police officer while several other officers present had their service weapons drawn.[4] (Tr. 24-26, 35-36).  Mr. Orejuela was not told that he was free to leave the residence, or that he was not required to answer the two questions asked by Sergeant Spagnolo before reading Mr. Orejuela his Miranda rights. (Tr. 24-26).

49.   Sergeant Spagnalo asked Mr. Orejuela whether he had driven the Acura eyewitnesses identified as the car driven by the suspect when fleeing the scene, and whether he had been at the scene of the crime that evening. (Tr. 25). These initial questions were clearly asked to elicit incriminating information.

50.   Because Mr. Orejuela was subject to custodial interrogation designed to elicit incriminating information before he was informed of his rights under Miranda, the Court concludes his responses to the two pre-Miranda questions must be

---

[4]The Government asserts that the officers had their service weapons drawn "[b]ecause the defendant was suspected of a shooting." (D.I. 20 at 3). While the officers had reason to be concerned for their safety, with at least five guns drawn, it is unlikely that Mr. Orejuela felt at liberty to leave.

13

suppressed.  Accordingly, the Court will grant Mr. Orejuela's
Motion To Suppress with respect to Mr. Orejuela's pre-<u>Miranda</u>
statements to Sergeant Spagnolo.

> 2.   *Mr. Orejuela's Post-<u>Miranda</u> Statements*

51.  Having concluded that Mr. Orejuela's pre-<u>Miranda</u>
warning statements were the product of custodial interrogation,
the Court must now determine the admissibility of his
post-<u>Miranda</u> warning statements under <u>Oregon v. Elstad</u>, 470 U.S.
298 (1985) and <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004).

52.  Mr. Orejuela contends that he did not knowingly,
intelligently and voluntarily waive his <u>Miranda</u> rights, and that
any and all post-<u>Miranda</u> warning statements he made should be
suppressed, having been obtained as a result of his initial
"involuntary" and "unconstitutional" statements. (D.I. 11 at 13;
D.I. 19 at 12).

53.  Pursuant to <u>Elstad</u>, 470 U.S. at 309, "[t]hough <u>Miranda</u>
requires that the unwarned admission must be suppressed, the
admissibility of any subsequent statement should turn ... solely
on whether it is knowingly and voluntarily made." Thus, "absent
deliberately coercive or improper tactics in obtaining the
initial statement, the mere fact that a suspect has made an
unwarned admission does not warrant a presumption of compulsion."
<u>Id</u>. at 314.

54.  "[W]here a statement is voluntary but made without the

14

benefit of proper <u>Miranda</u> warnings, '[a] subsequent
administration of <u>Miranda</u> warnings ... should suffice to remove
the conditions that precluded admission of the earlier statement.
In that case, the finder of fact may reasonably conclude that the
suspect made a rational and intelligent choice whether to waive
or invoke his rights." <u>U.S. v. Naranjo</u>, 426 F.3d 221, 228 (3d
Cir. 2005) (<u>quoting</u> <u>Elstad</u>, 470 U.S. at 314).   "Absent
deliberate coercion or improper tactics in obtaining an unwarned
statement, a careful and thorough administration of <u>Miranda</u>
warnings cures the condition that rendered the unwarned statement
inadmissible." <u>Reinert v. Larkins</u>, 379 F.3d 76, 90 (3d Cir.
2004).

    55.   In <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004), the
Supreme Court carved out an exception to <u>Elstad</u>, addressing the
admissibility of unwarned statements taken pursuant to an
official policy of questioning suspects without first giving
<u>Miranda</u> warnings, and then obtaining a second statement after
administrating the warnings. <u>Id</u>. at 616.  As set forth in Justice
Kennedy's concurrence, <u>Elstad's</u> legal standard applies unless a
two-step interrogation technique "was used in a calculated way to
undermine the <u>Miranda</u> warning." <u>Id.</u> at 622.

    56.   The Court concludes that there is no evidence that
Sergeant Spagnolo's failure to provide <u>Miranda</u> warnings was "an
intentional withholding that was part of a larger, nefarious

plot." <u>Reinert</u>, 379 F.3d at 91.  Sergeant Spagnolo's pre-<u>Miranda</u>
questions to Mr. Orejuela were neither extensive nor detailed.
(Tr. 25-25).  Because the Court concludes that Sergeant Spagnolo
did not deliberately withhold <u>Miranda</u> warnings, the Court will
apply <u>Elstad</u> rather than <u>Seibert</u> in determining the admissibility
of Mr. Orejuela's post-<u>Miranda</u> statements.

57.  When considering whether a post-<u>Miranda</u> "statement was
the result of a knowing, voluntary and intelligent waiver of the
protections implicit in the <u>Miranda</u> warnings," the Court may
consider who initiated the second interrogation, the time that
elapsed between the two interrogations, the extent to which the
same police were involved in both interrogations, the manner in
which the second interrogation was conducted, as well as any
other relevant factors.  <u>United States v. Tyler</u>, 164 F.3d 150,
158 (3d Cir. 1998).

58.  The Government bears the burden of establishing that a
waiver of rights was voluntary, knowing and intelligent.  <u>Id</u>. at
156.

59.  In determining whether the waiver was voluntary,
knowing and intelligent, the Court should make a two-pronged
inquiry: (1) The statement must be given voluntarily in the sense
that it was the "product of a free and deliberate choice rather
than the result of intimidation, coercion or deception;" and (2)
The waiver must be knowing and intelligent, in the sense that it

16

was "made with a full awareness both of the nature of the right
being abandoned and the consequences of the decision to abandon
it." <u>U.S. v. Sriyuth</u>, 98 F.3d 739, 748-749 (3d Cir.
1996)(internal citations omitted).

    60.  To assess the validity of a waiver, the Court must
consider the totality of the circumstances surrounding the
interrogation. <u>Id</u>. at 749.  An express written statement of a
waiver is strong proof as to the validity of a waiver.  <u>U.S. v.
Kabiarets</u>, 496 F.Supp.2d 394, 401 (D. Del. 2007).

> a.   Mr. Orejuela's Post-<u>Miranda</u> Statements to
>      Sergeant Spagnolo

    61.  The evidence establishes that Sergeant Spagnolo's pre-
<u>Miranda</u> interrogation of Mr. Orejuela was brief, and his
administration of the <u>Miranda</u> warnings, although belated, was
thorough and careful.  Further, Mr. Orejuela indicated and
demonstrated that he understood his rights in that he explained
to Sergeant Spagnolo in English what each right meant. (Tr. 27-
29). That Mr. Orejuela was able to explain to Sergeant Spagnolo's
satisfaction the meaning of each right supports a conclusion that
Mr. Orejuela was sufficiently proficient in the English language
to understand what was occurring, as well as the rights he was
waiving. (Tr. 27-29).  Therefore, the Court concludes that Mr.
Orejuela knowingly and intelligently waived his <u>Miranda</u> rights.

    62.  The Court further concludes that Mr. Orejuela's waiver
of his <u>Miranda</u> rights was voluntary.  The Court finds no evidence

17

that Sergeant Spagnolo referenced Mr. Orejuela's pre-<u>Miranda</u>
incriminating statements after reading him his rights, that Mr.
Orejuela was threatened or coerced into waiving his rights, or
that Sergeant Spagnolo made any promises to him about cooperation
or prosecution.   Mr. Orejuela indicated to Sergeant Spagnolo
that he understood he could stop any time during the questioning
if he did not want to answer any more questions. (Tr. 29).   Thus,
the Court concludes that Mr. Orejuela's waiver of his <u>Miranda</u>
rights was voluntary, knowing and intelligent, and was unaffected
by Sergeant Spagnolo's pre-<u>Miranda</u> questioning.

      63.   Accordingly, the Court will deny Mr. Orejuela's Motion
To Suppress with respect to his post-<u>Miranda</u> statements to
Sergeant Spagnolo.

            b.   Mr. Orejuela's Statements to Detective Penrod
                 and Special Agent DeShaies

      64.   Mr. Orejuela was informed of, and waived, his <u>Miranda</u>
rights twice following the second interrogation by Sergeant
Spagnolo conducted after the administration of <u>Miranda</u> warnings
to the Defendant. Later the morning of his arrest, Mr. Orejuela
spoke with Detective Penrod at the police station, where Mr.
Orejuela again indicated his understanding of his rights.   Then,
nearly three weeks later, Mr. Orejuela spoke with Special Agent
DeShaies at ICE headquarters, in Spanish, after executing a
written <u>Miranda</u> waiver form.

      65.   Even if the Court were to conclude that Mr. Orejuela's

18

post-<u>Miranda</u> statements to Sergeant Spagnolo were involuntary,
Mr. Orejuela's later statements to Detective Penrod and Agent
DeShaies were sufficiently removed from his pre-<u>Miranda</u>
statements to Sergeant Spagnolo so as to insulate the subsequent
confessions from the impact of the first.  <u>Elstad</u>, 470 U.S. at
326.

    66.  Mr. Orejuela's statements to Detective Penrod at the
police station, and to Special Agent DeShaies at ICE headquarters
were substantially similar to his post-<u>Miranda</u> statements to
Sergeant Spagnolo, and were in response to <u>Miranda</u> warnings
administered by different people, in different locations, in
different languages, different forms, and separated by
substantial time.  When Detective Penrod interviewed Mr.
Orejuela, he was unaware of Mr. Orejuela's prior statements, and
thus could not have used these prior statements to undermine
<u>Miranda</u>. (Tr. 63-64, 67).  Special Agent DeShaies had not spoken
to Sergeant Spagnolo or to Detective Penrod prior to his
interrogation of Mr. Orejuela on March 9, 2007, and testified
that he was unaware that Mr. Orejuela had given a prior statement
to Detective Penrod. (Tr. 88). The Court concludes that Mr.
Orejuela's decision to waive his <u>Miranda</u> rights on these later
occasions after administrations of <u>Miranda</u> warnings supports the
conclusion that the pre-<u>Miranda</u> interrogation by Sergeant
Spagnolo had no coercive effect or impact.

19

67.  With respect to Mr. Orejuela's statements to Detective
Penrod at the police station, the Court concludes that the
Government has demonstrated compliance with <u>Miranda</u> and its
progeny.

68.  The record evidence establishes that before
interrogating Mr. Orejuela, Detective Penrod read Mr. Orejuela
his <u>Miranda</u> rights, stopping after each right to ask Mr. Orejuela
whether he understood. Mr. Orejuela either nodded his
understanding, or responded "yes."  After Detective Penrod
finished reading Mr. Orejuela his rights, he asked again whether
he understood the rights he had just been read, and Mr. Orejuela
responded, "Yes." Before administering his rights, Mr. Orejuela
indicated to Detective Penrod that he spoke English.[5] (Gov't Exh.
3).  Thus, the Court concludes that Mr. Orejuela knowingly and
intelligently waived his <u>Miranda</u> rights.

69.  The Court further concludes that Mr. Orejuela's waiver
of his rights was voluntary.  The evidence establishes that,
prior to reading Mr. Orejuela the <u>Miranda</u> warnings, Detective
Penrod and Officer Garcia clearly identified themselves and
stated their purpose for speaking with Defendant.  Mr. Orejuela
does not contend, and the Court does not find that Detective

---

[5]Officer Garcia, a Spanish-speaking police officer, informed
Mr. Orejuela that he had the option to speak Spanish if he found
English too difficult.  However, Mr. Orejuela proceeded in
English. (Gov't Exh. 3).

Penrod made any promises or threats to Mr. Orejuela that would render Mr. Orejuela's waiver of his rights coerced, and there is no evidence that Mr. Orejuela's waiver was elicited by deceit. (Gov't Exh. 3).  Thus, the Court concludes that Mr. Orejuela knowingly and voluntarily waived his rights at the interview with Detective Penrod on February 18, 2007 .

70.  Accordingly, the Court will deny Mr. Orejuela's Motion To Suppress with respect to his statements to Detective Penrod.

71.  The record evidence demonstrates that, after establishing Mr. Orejuela's immigration status, Special Agent DeShaies read Mr. Orejuela his <u>Miranda</u> rights in Spanish, and Mr. Orejuela executed a <u>Miranda</u> Warning Declaration of Rights, also in Spanish. (Gov't Exh. 4).  Further, Mr. Orejuela orally indicated to Agent DeShaies that he understood his rights. (Tr. 86).  Thus, the Court concludes that Mr. Orejuela knowingly and intelligently waived his <u>Miranda</u> rights.

72.  The Court further concludes that Mr. Orejuela's waiver of his rights was voluntary.  Mr. Orejuela does not contend, and the Court does not find that Special Agent DeShaies made any promises or threats to Mr. Orejuela that would render Mr. Orejuela's waiver of his rights coerced, and there is no evidence that Mr. Orejuela's waiver was elicited by deceit. (Tr. 83-95). Thus, the Court concludes that Mr. Orejuela knowingly and voluntarily waived his rights at the interview with Special Agent

DeShaies on March 9, 2007 .

73.   Accordingly, the Court will deny Mr. Orejuela's Motion
To Suppress with respect to his sworn statements to Agent
DeShaies.

D.   Whether the Firearm Is Subject to Suppression

74.   Because the Court concludes that Mr. Orejuela's post-
Miranda statements to Sergeant Spagnolo, Detective Penrod and
Special Agent DeShaies were a result of Mr. Orejuela's knowing,
voluntary and intelligent waiver of his Miranda rights, the Court
concludes that any physical evidence seized as a result of these
statements was lawfully recovered.   Accordingly, the Court will
deny Mr. Orejuela's Motion To Suppress physical evidence obtained
as a result of his post-Miranda statements

## IV.   CONCLUSION

For the reasons discussed, the Court will grant Mr.
Orejuela's Motion To Suppress Physical Evidence And Statements
(D.I. 9) with respect to Mr. Orejuela's two statements obtained
prior to Sergeant Spagnolo's administration of the Miranda
rights.   The Court will deny Mr. Orejuela's Motion to Suppress
Physical Evidence and Statements (D.I. 9) with respect to his
post-Miranda statements to Sergeant Spagnolo, Detective Penrod
and Special Agent DeShaies, as well as any physical evidence
recovered as a result of these statements.

An appropriate Order will be entered.